**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA DONNELLAN,** | : | |
| | : | |
| **Plaintiff,** | : | **3:23-CV-01728** |
| | : | **(JUDGE MARIANI)** |
| v. | : | |
| | : | |
| **HENRY LINDNER, M.D.,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant's Rule 12(b)(6) Motion to Dismiss and/or Motion to Strike Pursuant to

Rule 12(f) (Doc. 7) is pending before the Court. With his Motion, Defendant asks the Court

to strike all references to "reckless", "wanton", "outrageous", and "grossly negligent

conduct." (*Id*. ¶ 35.) Additionally, Defendant asks the Court to dismiss Plaintiff's requests for

punitive damages and Intentional Infliction of Emotional Distress claim. (*Id*. at 7, 10.)

The Plaintiff in the Complaint is Patricia Donnellan. (Doc. 1 ¶ 4.) The Defendant is

Henry Lindner, M.D. (*Id*. ¶ 5.)  Plaintiff's Complaint (Doc. 1) alleges that Lindner diagnosed

Plaintiff with babesiosis without confirmation that Plaintiff had any parasitic infection. Plaintiff

also alleges that, because of this diagnosis, Lindner prescribed Plaintiff with numerous

medications over a significant period of time that caused Plaintiff physical and emotional

harm. Despite Plaintiff informing Lindner of the serious side effects that she was

experiencing, Plaintiff alleges that Lindner continued to prescribe high dosages of the same

medication. Plaintiff's Complaint filed on October 17, 2023 contains two counts: Count I asserts a negligence claim under the Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. § 1303.505(a); and Count II asserts an Intentional Infliction of Emotional Distress claim. For the reasons explained below, the Court will deny Defendant's Motion (Doc. 7).

## II. BACKGROUND[1]

Plaintiff Patricia Donnellan ("Plaintiff") is an adult citizen of the State of Michigan. (Doc. 1 ¶ 4.) Defendant Henry Lindner, M.D. ("Lindner") is an adult citizen of the Commonwealth of Pennsylvania. (*Id*. ¶ 5.) At all relevant times, Lindner was a physician licensed to practice medicine in the Commonwealth of Pennsylvania, holding himself out as a practitioner in the areas of endocrinology and infectious disease. (*Id*.) Lindner maintained a medical practice, office, and place of business at 230 West Tioga Steet, Suite 5, Tunkhannock, Pennsylvania, 18657. (*Id*.)

In November 2008, Plaintiff was thirty-one (31) years old, and she presented to Lindner complaining of achiness, weight gain, depression, problems with her sleep, and other symptoms consistent with chronic fatigue. (*Id*. ¶ 6.) At all relevant times, Lindner advertised on a website, HormoneRestoration.com, which suggested that he could help restore energy and health to patients with Plaintiff's symptoms. (Doc. 1 ¶ 7.)

---

[1] Unless otherwise noted, the background information reiterates facts contained in Plaintiff's Complaint (Doc. 1).

HormaneResoration.com does not mention whether Lindner is board certified in any specialty. (*Id*. ¶ 8.) It states that he began a residency in psychiatry, but resigned after one year and became a general medical officer and flight surgeon in the United States Air Force. (*Id*.) From 2008 to 2022, Plaintiff was a patient of Lindner's and was under his care. (*Id*. ¶ 9.) Plaintiff met Lindner in person approximately three times during this period, and normally communicated with him by email, and occasionally by phone. (*Id*.)

In and around December 2020, Lindner ordered testing to determine whether Plaintiff was infected by a babesia parasite, an infection caused by a babesia parasite is known as "babesiosis," and can be caused in humans by a tick bite. (Doc. 1 ¶ 10.) *Babesia odocoilei* is one particular species of the babesia parasite, and Lindner says that it causes chronic babesiosis infections in humans. (*Id*. ¶ 11.) However, almost all cases of babesiosis in humans in the United States are caused by *babesia microti*, not *babesia odocoilei*. (*Id*.) Lindner has acknowledged that cases of human infection cases by *babesia odocoilei* are "unknown to mainstream medicine" and difficult to detect by laboratory testing. (*Id*.)

Plaintiff alleges that it is standard practice for doctors in the United States to diagnose babesiosis using epidemiological risk factors and clinical evidence, and to confirm the diagnosis with a blood smear examination or polymerase chain reaction (PCR) test. (*Id*. ¶ 12.) The testing that Lindner ordered in December 2020 included a PCR test, which was negative for both *babesia microti* and *babesia duncani* (another babesia species). (Doc. 1 ¶

13.) The testing did produce a positive result for *babesia duncani* antibodies, but that result alone was not a sufficient basis for a reasonable doctor to diagnose an active infection of babesiosis, given the negative PCR test and absence of other laboratory confirmation. (*Id*.)

No PCR test or blood smear examination ever confirmed that Plaintiff was infected with babesiosis. (*Id*. ¶ 14.) Nonetheless, Lindner diagnosed Plaintiff with babesiosis. (*Id*.) According to the Centers for Disease Control and Prevention ("CDC"), for non-immunosuppressed people, babesiosis is either asymptomatic or causes an acute illness, which should be confirmed through testing and treated for 7-10 days with antimicrobials, such as azithromycin and atovaquone. (*Id*. ¶ 15.)

Lindner knew that mainstream medicine views babesiosis as an acute disease to be treated with a short course of antimicrobial medication. (*Id*. ¶ 16.) Plaintiff claims that a reasonable physician does not prescribe antimicrobial medications for months or longer without a specifically identified objective rationale, confirmed by testing, because of the risk that the patient will develop antimicrobial resistance and other adverse side effects. (Doc. 1 ¶ 17.)

Despite not having a blood smear examination or PCR test result confirming that Plaintiff had babesiosis, Lindner prescribed antimicrobial medications to Plaintiff for more than twenty months. (*Id*. ¶ 18.) Lindner knew that some of the medications he prescribed, such as tafenoquine, were not FDA approved for the treatment of babesiosis, or were not

routinely recommended by the CDC or the Infectious Diseases Society of America ("IDSA").
(*Id.* ¶ 19.)

On April 20, 2021, Lindner emailed Plaintiff a document he wrote, titled "The
Treatment of Chronic Babesiosis." (*Id.* ¶ 20.) The document showed that Lindner was aware
that his treatment program for babesiosis would cause his patients to become more ill, with
symptoms including fatigue, brain fog, headaches, muscle weakness, anxiety, and delirium.
(*Id.*)

Lindner convinced Plaintiff that the harm caused by babesia parasites was worse
than the possible side effects she would experience. (Doc. 1 ¶ 21.) Plaintiff relied on
Lindner's diagnosis and treatment advice for babesiosis and followed his instructions with
respect to the medications he prescribed and the dosing of those medications. (*Id.* ¶ 22.)
Plaintiff relied on Lindner's diagnosis and treatment advice for babesiosis in part because
Lindner told Plaintiff that he had diagnosed babesiosis in his own daughter, and he had
developed the treatment program for her. (*Id.* ¶ 23.)

Lindner prescribed Plaintiff and other babesiosis patients high doses of
corticosteroids, including prednisone, hydrocortisone, and dexamethasone, which he
claimed could address the inflammation patients experienced as a result of the antimicrobial
medication. (*Id.* ¶ 24.) Lindner prescribed corticosteroids for Plaintiff between 2008 and
2020 to treat the symptoms for which she originally sought his medical care. (*Id.* ¶ 25.)

During these years, Plaintiff's corticosteroid doses rarely exceeded the equivalent of 20 milligrams of prednisone per day. (*Id.*)

Between December 2020 and November 2022, Plaintiff took the additional medications prescribed by Lindner as part of his babesiosis protocol, which included even higher doses of corticosteroids than those previously prescribed. (Doc. 1 ¶ 26.) Plaintiff regularly reported her dosages, symptoms, and reactions to Lindner by email. (*Id.*) In May 2022, Plaintiff was taking approximately 40 milligrams of prednisone equivalent per day. (*Id.* ¶ 27.)

On May 22, 2022, Plaintiff wrote to Lindner that she did not think she could continue with the babesiosis protocol because she was in so much pain and feeling suicidal. (*Id.*) Lindner replied to Plaintiff on May 23, 2022, that he knew how she was feeling because he had "been through it with my daughter." (*Id.* ¶ 28.) In the same email, Lindner acknowledged that the babesiosis protocol was making Plaintiff "more ill," that suicidal ideation was a common side effect of the protocol, and that another one of his patients had developed painful stretch marks on their skin, just as Plaintiff had. (*Id.*)

By September 2022, Plaintiff had stopped taking antimicrobial medications and had reduced her corticosteroid doses. (Doc. 1 ¶ 29.) On September 28, 2022, Lindner directed Plaintiff to begin taking dexamethasone, and advised a "fast-track approach" of increasing

the doses. (*Id.* ¶ 30.) Lindner claimed that this approach worked on his daughter, but also "landed two very sick patients in the hospital." (*Id.*)

On October 15, 2022, Plaintiff reported taking the prednisone equivalent of approximately 120 milligrams in one day, and Lindner directed Plaintiff to "continue the higher steroid dosing." (*Id.* ¶ 31.) Lindner added that she "should just try more Dex gradually up to the limit of feeling overstimulated." (*Id.*)

Lindner had earlier written to Plaintiff (on March 28, 2022) that "[i]n a sane world you'd be in a hospital for this treatment, but if you got to a hospital now the doctors will stop your antibabesials and lower your prednisone dose precipitously." (*Id.* ¶ 33.) On October 19, 2022, Plaintiff wrote to Lindner that the dexamethasone was not working. (Doc. 1 ¶ 34.) Lindner replied the same day, "I think you have not taken as much Dex as you need yet," and that Plaintiff was "clearly" in the group of his patients – including his daughter – who needs high doses. (*Id.*) In the same email, Lindner wrote, "[m]y daughter has unfortunately had to take more Dex/Pred than any person has ever taken, in all of medical history I believe," but she had "no choice." (*Id.*) In the same email, Lindner acknowledged that "Dex/Pred has negative effects on the body," including "facial puffiness and abdominal weight gain," and that "[a]t high doses the muscles atrophy." (*Id.* ¶ 35.) He argued that while these side effects are not good, "the alternative is to stay in your current condition indefinitely." (*Id.*)

7

Plaintiff wrote to Lindner on October 24, 2022, that she "woke up feeling like death," that she was in extreme pain, that she felt worse as she took more dexamethasone, and that she felt "like I am crawling towards death." (Doc. 1 ¶ 36.) On October 27, 2022, Plaintiff wrote to Lindner, "I am so so horribly incapacitated. I can't stand up on my own. I need help getting to the bathroom. My knees feel so inflamed. My shoulders feel so inflamed. My face and eyes are swollen. I can't get any pain relief from Advil, or Tylenol with codeine. I honestly feel like I am dying." (*Id*. ¶ 37.) In reply emails to Plaintiff the same day, Lindner wrote that he wanted to keep Plaintiff out of the hospital, because "they will dismiss babesiosis, blame all your problems on steroids and antimalarial medications, and give you only a minimal steroid dose." (*Id*. ¶ 38.)

On November 1, 2022, Lindner spoke to Plaintiff on the phone, and noted in her record that his plan was to "try much higher steroid dosing. . . . Patient will take 20mgs pred now, and repeat every 2hrs until feeling much better or overdosed." (*Id*. ¶ 39.) The next day, November 2, 2022, Plaintiff reported to Lindner that she had taken 20 milligrams of prednisone every two hours, as he directed, for a total of 220 milligrams of prednisone. (*Id*. ¶ 40.) She reported that her lower belly was swollen, and it was hard for her to get up or bend over. (*Id*.) Lindner acknowledged that there was "quite a bit of edema in your face," and that "it must be due to the high prednisone doses." (*Id*.)

8

On November 3, 2022, Lindner wrote to Plaintiff that "[y]ou may have a very high steroid requirement and we just haven't gotten close to it yet." (Doc. 1¶ 41.) He directed her to start the day with 8 milligrams of dexamethasone and 10 milligrams of prednisone, followed by 4 milligrams of dexamethasone and 10 milligrams of prednisone "all day." (*Id*.)

On November 4, 2022, Plaintiff presented to the Emergency Room at CPMC Van Ness in San Francisco, complaining of pain, among other symptoms. (*Id*. ¶ 42.) She was diagnoses with pneumonia and discharged, and she informed Lindner of her diagnosis and discharge by email. (*Id*.) On November 5, 2022, Plaintiff wrote to Lindner that she did not have enough corticosteroid pills for his prescribed doses, and that she was "very frightened" that she would never walk again. (*Id*. ¶ 43.) On November 6, 2022, Lindner wrote to Plaintiff that he had sent new corticosteroid prescriptions for her, and added "I'm scared about you too—and hoping your don't have steroid myopathy. . . . We'll found out quickly with the very high Dex/pred dosing." (*Id*. ¶ 44.) On November 7, 2022, Plaintiff confirmed in an email to Lindner that she was following his prescribed dosing instructions. (Doc. 1 ¶ 45.) Lindner replied that Plaintiff should "take 128 mgs of Dex and 80 mgs of prednisone daily to get the equivalent of 976mgs of prednisone." (*Id*.)

On November 9, 2022, Plaintiff wrote to Lindner that she had followed his advice and taken 976 milligrams of prednisone equivalent in approximately 18 hours. (*Id*. ¶ 46.) In a reply the same day, Lindner suggested reducing the prednisone by 10 milligrams per dose

and wrote "for now I think you should continue the higher steroid doses." (*Id.* ¶ 47.) Plaintiff

continued suffering from a variety of painful side effects of the corticosteroids, and on

November 12, 2022, she presented to UCSF Medical Center in San Francisco. (*Id.* ¶ 48.)

She was diagnosed with steroid myopathy, a pulmonary embolism, two deep vein

thromboses, multiple subacute bilateral rib fractures, and features of Cushing's disease.

(*Id.*)

On November 13, 2022, Lindner wrote a letter to Plaintiff's treating physicians, which

included "I had her take high-dose Dexamethasone, 128mgs/day, for 3 days. Her weakness

only worsened, indicating steroid myopathy." (*Id.* ¶ 49.) Plaintiff alleges that the care and

treatment caused by Lindner resulted in steroid myopathy, pulmonary embolism, deep vein

thromboses, subacute bilateral rib fractures, osteopenia, Cushing's syndrome, hair loss,

stretch marks on the skin, scarring on the skin, facial edema, acne, weight gain and obesity,

post-traumatic stress disorder, among other damages. (*Id.* ¶ 50.)

Plaintiff alleges two distinct counts within her Complaint (Doc. 1). Count I of Plaintiff's

Complaint alleges negligence on the part of Defendant for failing to follow the standard of

care for the treatment of babesiosis. (*Id.* ¶¶ 52-56.) Count II of Plaintiff's Complaint alleges

an Intentional Infliction of Emotional Distress claim, contending that Lindner's medical

treatment of Plaintiff constituted extreme and outrageous conduct. (*Id.* ¶¶ 57-61.)

10

### III. STANDARD OF REVIEW

#### A. Motion to Dismiss

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President*

*of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id*.

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal,* 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting *Iqbal,* 556 U.S. 679).

The Third Circuit Court of Appeals has identified the following three-step inquiry as appropriate to determine the sufficiency of a complaint pursuant to *Twombly* and *Iqbal:*

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Burch v. Milberg Factors, Inc.,* 662 F.3d 212, 221 (3d Cir.2011); *see also Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013); *Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir. 2010).

In considering a motion to dismiss, the reviewing court examines:

the "complaint, exhibits attached to the complaint, [and] matters of public record," *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010), we can also consider documents "that a defendant attaches as an exhibit to a motion to dismiss," *Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), if they are "undisputedly authentic" and "the [plaintiff's] claims are based [on them]," *Mayer*, 605 F.3d at 230. That holding extends to settlement material because plaintiffs "need not provide admissible proof at th[e] [motion-to-dismiss] stage." *In re OSG Sec. Litig.*, 12 F. Supp.3d 619, 622 (S.D.N.Y. 2014); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp.3d 936, 961 n.5 (N.D. Cal. 2014) (same). Moreover, the Supreme Court has been clear about the scope of our review, stating we "*must* consider the complaint in its entirety, as well as other sources [we] ordinarily examine when ruling on ... motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L.Ed.2d 179 (2007) (emphasis added).

*Estate of Roman v. City of Newark*, 914 F.3d 789, 796–97 (3d Cir.), *cert. denied sub nom. Estate of Roman v. City of Newark, New Jersey*, 140 S. Ct. 82, 205 L. Ed. 2d 28 (2019), and *cert. denied*, 140 S. Ct. 97, 205 L. Ed. 2d 28 (2019).

Even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

[E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## B. Motion to Strike

Federal Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "A court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)." *Krisa v. Equitable Life Assurance Soc'y*, 109 F.Supp.2d 316, 319 (M.D. Pa. 2000) (quoting *North Penn Transfer, Inc. v. Victaulic Co. of Am.*, 859 F.Supp. 154, 158 (E.D. Pa. 1994)).

"Motions to strike, however, are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Id.* (quoting *North Penn*, 859 F.Supp. at 158) (internal quotation marks omitted). *See also, Karpov v. Karpov*, 307 F.R.D. 345, 348 (D. Del. 2015) ("In proceeding on a motion to strike for relevancy, the movant must show that the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration and that their presence in the pleadings will be prejudicial.").

## IV. ANALYSIS

Defendant contends that the Court should strike "all references to 'reckless', 'wanton', 'outrageous', and 'grossly negligent conduct'" from Plaintiff's Complaint. (Doc. 7 ¶ 35.) Defendant also argues that the Court should dismiss portions of Plaintiff's Complaint on two grounds: (1) Plaintiff cannot state a claim for punitive damages; and (2) Plaintiff fail to

state a claim for their Intentional Infliction of Emotional Distress claim. (Doc. 7 at 5, 7.) The Court will address Defendant's request to strike and each alleged basis for dismissal in turn.

## A. Motion to Strike

Here, pursuant to Fed. R. Civ. P. 12(f), Defendant "requests that all references to 'reckless', 'wanton', 'outrageous', and 'grossly negligent conduct' must be stricken from the Complaint." (Doc. 7 ¶ 35.) Lindner fails to explain why such allegations are "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P. 12(f). Lindner similarly provides no arguments in his motion or briefing to suggest that "the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration and that their presence in the pleadings will be prejudicial." *Karpov*, 307 F.R.D. at 348. Additionally, although such allegations are legal conclusions that are not entitled to the presumption of truth for the purposes of a 12(b)(6) motion to dismiss, *Iqbal,* 556 U.S. 679, this principle does not equate to a determination that those allegations are also redundant, immaterial, impertinent, or scandalous.

As the Court notes, *infra* at 18, Plaintiff alleges facts in her Complaint as to Lindner's conduct that could be plausibly characterized as "reckless, wanton, outrageous, and grossly negligent." (*See, e.g.,* Doc. 7 ¶¶ 14, 16, 18, 19, 20, 24, 28, 30, 31, 38, 39, 40, 45, 46, 48, 49.) In essence, Plaintiff's Complaint alleges facts that contend that Lindner misdiagnosed Plaintiff with babesiosis and overprescribed significant quantities of medications despite

knowing the dangers of doing so and despite Plaintiff's repeated complaints. (*Id.*) Although Lindner is entitled to deny the legal conclusions offered in Plaintiff's complaint that describe Lindner's acts as "reckless, wanton, outrageous, and grossly negligent," those legal conclusions are not improper, redundant, or unnecessarily derogatory. *See Karpov*, 307 F.R.D. at 348; *see also Wolking v. Lindner*, No. 3:23-CV-806, 2024 WL 84206, at *4 (M.D. Pa. Jan. 8, 2024) (finding under nearly identical factual circumstances that Lindner failed to explain why the plaintiff's allegations in that case were redundant, immaterial, impertinent, or scandalous). Therefore, the Court will deny Lindner's request (Doc. 7 ¶ 35) to strike all references to "reckless", "wanton", "outrageous", and "grossly negligent conduct" from Plaintiff's Complaint (Doc. 1).

## B. Motion to Dismiss

Defendant argues that the Court should dismiss portions of Plaintiff's Complaint on two grounds: (1) Plaintiff cannot state a claim for punitive damages; and (2) Plaintiff fail to state a claim for their Intentional Infliction of Emotional Distress claim. (Doc. 7 at 5, 7; Doc. 8 at 5, 7.) The Court will address each argument for partial dismissal in turn.

### 1. Punitive Damages

Defendant argues that Plaintiff's request for punitive damages should be dismissed because the Complaint does not allege facts that would establish grounds for an award of punitive damages under Pennsylvania law. (Doc. 7 ¶¶ 26-33; Doc. 8 at 5-7.) Upon review of

the allegations contained within her Complaint, Plaintiff adequately offers factual allegations that could entitled her to punitive damages.

In diversity jurisdiction cases, federal courts must apply state substantive law and federal procedural law. *See Schmigel v. Uchal*, 800 F.3d 113, 119 (3d Cir. 2015). Because Plaintiff brings her claims for punitive damages under Pennsylvania state law, that law applies. *See Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 (3d Cir. 1992). Pennsylvania has codified punitive damages as to healthcare providers in the Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. § 1303.505(a). The MCARE states that "punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others." 40 P.S. § 1303.505(a).[2] The MCARE continues by stating that "[i]n assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider." (*Id.*)

As this court has previously held,

> [b]ecause a punitive damages award hinges on a defendant's state of mind, a judgment on the pleadings that asks to dismiss a punitive damages claim is not appropriate. A defendant's state of mind can only generally only be answered with the development of a full factual record. This is well established in this District, and in our sister districts across the Commonwealth. S*ee, e.g.*, *Harvell v. Brumberger*, No. 19-cv-2124, 2020 WL 6947693, at *8, 2020 U.S. Dist.

---

[2] "A showing of gross negligence is insufficient to support an award of punitive damages." 40 P.S. § 1303.505(b).

LEXIS 206828, at * 19-21 (M.D. Pa. Nov. 4, 2020) (report and recommendation adopted by 2020 WL 6946575, 2020 U.S. Dist. LEXIS 221668 (M.D. Pa. Nov. 25, 2020)) ("courts have deemed [ ] motions to dismiss punitive damages claims to be premature and inappropriate where, as here, the complaint alleges reckless conduct."); *Kerlin v. Howard*, No. 18-cv-481, 2018 WL 4051702, at *2, 2018 U.S. Dist. LEXIS 144152, at *3-4 (M.D. Pa. Aug. 24, 2018) ("this Court has consistently held that it is premature to dismiss demands for punitive damages prior to discovery");[4] *Tjokrowidjojo v. San Lucas*, No. 20-cv-6564, 2021 WL 1143379, at *2, 2021 U.S. Dist. LEXIS 56655, at *2 (E.D. Pa. Mar. 25, 2021) ("courts routinely deny requests to dismiss punitive damages claims in motor vehicle accident cases at the onset of litigation."); *Cobb v. Nye*, No. 14-cv-865, 2014 WL 7067578, at *——, 2014 U.S. Dist. LEXIS 172087, at *8-10 (M.D. Pa. Dec. 12, 2014) (same, as applied to a driver who rear ended plaintiff's car); *Maturo v. Pugh*, No. 20-cv-1464, 2020 WL 4015240, 2020 U.S. Dist. LEXIS 124868 (E.D. Pa. July 16, 2020) (same, as applied to a driver who made an improper left turn).

*Medina v. Haas*, No. 4:21-CV-1000, 2021 WL 6063237, at *4 (M.D. Pa. Dec. 22, 2021).

As applied here in the medical malpractice context, if Lindner was engaged in willful or wanton conduct or acted with a reckless indifference to the rights of others, then a punitive damages award may be warranted. *See* 40 P.S. § 1303.505(a). Because this assessment necessarily involves an evaluation of Lindner's subjective mental state, discovery should be permitted to probe that issue.

Additionally, Plaintiff pleads facts in her Complaint that could plausibly amount to willful or wanton conduct or evidence of a reckless indifference to the rights of others. Plaintiff alleges that "no PCR test or blood smear examination ever confirmed that Plaintiff was infected with babesiosis. Nonetheless, Lindner diagnosed Plaintiff with babesiosis." (Doc. 1 ¶ 14.) Plaintiff also alleges that, despite the CDC recommending that babesiosis be

"treated for 7-10 days with antimicrobials" (*Id.* ¶ 15), Lindner subjected Plaintiff to extensive dosages of prednisone and other medications that were not FDA approved for the treatment of babesiosis and that resulted in damages. (*Id.* ¶¶ 15, 19, 26, 27, 30, 31, 45.) Specifically, Plaintiff alleges that Lindner instructed that Plaintiff should "take 128 mgs of Dex and 80 mgs of prednisone daily to get the equivalent of 976mgs of prednisone." (*Id.* ¶ 46.) Plaintiff also claims that Lindner "was aware that his treatment program for babesiosis would cause his patients to become more ill, with symptoms including fatigue, brain fog, headaches, muscle weakness, anxiety, and delirium." (*Id.* ¶ 20.) Plaintiff alleges that "Lindner acknowledged that 'Dex/Pred has negative effects on the body,' including 'facial puffiness and abdominal weight gain,' and that '[a]t high doses the muscles atrophy.'" (*Id.* ¶ 35.)

In ruling on a motion to dismiss in a case against the same Defendant under nearly identical factual circumstances to those here, this Court has previously denied dismissal because the plaintiff in that case alleged that Lindner "directed [Plaintiff] to consume medication in dosages far exceeding normal limits, over an extended period, and while she reported severe symptoms. From such allegations a reasonable factfinder could infer that he acted with reckless indifference." *Wolking,* 2024 WL 84206 at *4. Such conduct by Lindner is precisely what is alleged in Plaintiff's Complaint. (Doc. 1 ¶¶ 14, 15, 19, 20 26, 27, 30, 31, 45, 46.)

Other courts in the Third Circuit have also found relatively comparable alleged conduct by medical care teams to plausibly justify a punitive damages award. *See, e.g., O'Leary v. Wexford Health Sources, Inc.*, No. CV 16-1393, 2018 WL 1010748, at *5-6 (E.D. Pa. Feb. 22, 2018) (denying the defendants' motion to dismiss punitive damages because that complaint plausibly alleged that "Defendants were aware of [the plaintiff's] significant medical needs" and nonetheless "delayed [the plaintiff's] necessary medical care").

Because Plaintiff has alleged facts that plausibly support "reckless, wanton, outrageous, and negligent conduct" on the part of Lindner (Doc. 1 ¶ 56), Plaintiff has plead sufficient allegations to allow her request for punitive damages to continue at this stage. Therefore, Defendant's partial motion to dismiss on this basis will be denied.

### 2. Intentional Infliction of Emotional Distress

Defendant also contends that partial dismissal is warranted with respect to Plaintiff's Intentional Infliction of Emotional Distress claim (Doc. 1 ¶¶ 57-61). (Doc. 8.) Plaintiff contends that she pleads sufficient facts in her Complaint to make out an Intentional Infliction of Emotional Distress claim. (Doc. 9.) For similar reasons explained with respect to Plaintiff's request for punitive damages, Defendant's request to dismiss Plaintiff's Intentional Infliction of Emotional Distress claim will be denied.

For Plaintiff to state a claim for Intentional Infliction of Emotional Distress, she must plead facts sufficient to show that Lindner acted with "intentional outrageous or extreme

conduct" which caused her severe emotional distress. *Swisher v. Pitz,* 868 A.2d 1228, 1230

(Pa. Super. Ct. 2005). "Outrageous or extreme conduct has been defined by the appellate

courts of this Commonwealth as conduct that is so outrageous in character, so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious,

and utterly intolerable in civilized society." *Id.* (internal quotation marks omitted). That is,

> it has not been enough that the defendant has acted with intent which is tortious
> or even criminal, or that he has intended to inflict emotional distress, or even
> that his conduct has been characterized by "malice," or a degree of aggravation
> that would entitle the plaintiff to punitive damages for another tort,
>
> *Hoy v. Angelone,* 720 A.2d 745, 754 (Pa. 1998) (internal citations and quotation

marks omitted).

"With regard to the element of outrageousness, it is for the court to determine in the

first instance whether the defendant's conduct may reasonably be regarded as so extreme

and outrageous to permit recovery." *Swisher,* 868 A.2d at 1231.

> Cases which have found a sufficient basis for a cause of action of intentional
> infliction of emotional distress have ... presented only the most egregious
> conduct. *See[,] e.g., Papieves v. Lawrence,* 263 A.2d 118 (Pa. 1970)
> (defendant, after striking and killing plaintiffs son with automobile, and after
> failing to notify authorities or seek medical assistance, buried body in a field
> where discovered two months later and returned to parents (recognizing but
> not adopting section 46)); *Banyas v. Lower Bucks Hospital,* 437 A.2d 1236 (Pa.
> Super. Ct. 1981) (defendants intentionally fabricated records to suggest that
> plaintiff had killed a third party which led to plaintiff being indicted for homicide);
> *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir. 1979)
> (defendant's team physician released to press information that plaintiff was
> suffering from fatal disease, when physician knew such information was false).

*Hoy,* 720 A.2d at 754.

Furthermore, a plaintiff must demonstrate physical injury or harm to sustain a cause of action for intentional infliction of emotional distress. *Fewell v. Besner*, 664 A.2d 577, 582 (Pa. Super. Ct. 1995) (citing *Kazatsky v. King David Mem'l Park, inc.*, 527 A.2d 988, 995 (Pa. 1987) ("Those truly damaged should have little difficulty in procuring reliable testimony as to the nature and extent of their injuries [A]t the very least, existence of the alleged emotional distress must be supported by competent medical evidence.")); *Criveilaro v. Pennsylvania Power and Light Co.*, 491 A.2d 207 (Pa. Super. Ct. 1985) (finding that symptoms of depression, nightmares, anxiety requiring psychological treatment, and ... ongoing mental, physical and emotional harm sufficiently stated physical manifestations of emotional suffering to sustain a cause of action).

Here, similar to Plaintiff's request for punitive damages, Plaintiff's Intentional Infliction of Emotional Distress claim hinges on Lindner's subjective state of mind. (*See* Doc. 1 ¶¶ 58, 59, 60, 61.) In relevant part, Plaintiff alleges that "[n]o PCR test or blood smear examination ever confirmed that Plaintiff was infected with babesiosis. Nonetheless, Dr. Lindner diagnosed Plaintiff with babesiosis." (*Id.* ¶ 14.) Plaintiff states that "[a]ccording to the Centers for Disease Control and Prevention ("CDC"), for non-immunosuppressed people, babesiosis is either asymptomatic or causes an acute illness, which should be confirmed through testing and treated for 7-10 days with antimicrobials, such as azithromycin and

atovaquone." (*Id.* ¶ 15.) Plaintiff claims that "Dr. Lindner knew that mainstream medicine views babesiosis as an acute disease to be treated with a short course of antimicrobial medication," but that Lindner nonetheless "prescribed antimicrobial medications to Plaintiff for more than twenty months." (*Id.* ¶¶ 16, 18.) Additionally, Plaintiff alleges that Lindner prescribed very high doses of the medication despite being aware of the continuing negative consequences to Plaintiff by doing so. (*Id.* ¶¶ 27, 30, 31, 34, 35, 39, 40, 41, 44, 46, 47.)

Plaintiff concludes her Complaint by alleging that "Plaintiff [has] suffered and will continue to suffer physical manifestations of severe emotional distress, including stress, anxiety, depression, all of a continuing nature and requiring psychological treatment, as well as fatigue, insomnia, nightmares, continuing and recurring nausea and pain, and other symptoms." (*Id.* ¶ 61.)

As was the case with Defendant's arguments for dismissal with respect to punitive damages, this Court has previously addressed a motion to dismiss by the same Defendant with respect to an Intentional Infliction of Emotional Distress claim. In that case, this Court held that dismissal of that plaintiff's Intentional Infliction of Emotional Distress claim was not warranted:

> Accepting the facts as alleged, that Dr. Lindner directed Stacey to regularly take significantly more than (and at points almost twenty times) the normal limit of prednisone over the course of several months, despite her reports of severe side effects, the court concludes that Plaintiffs have adequately plead extreme and outrageous conduct.

*Wolking,* 2024 WL 84206 at *5.

As addressed *supra*, Plaintiff pleads facts that could plausibly show intentionally outrageous or extreme conduct on the part of Lindner, as well as physical injury that was caused by Lindner's conduct while treating Plaintiff. *See, e.g., Toney v. Chester Cnty. Hosp.*, 961 A.2d 192, 200 (Pa. Super. Ct. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011) (allegations including nausea, headaches, insomnia satisfied physical harm requirement); *Fargione v. Sweeney*, 2017 WL 4283955, at *5 (E.D. Pa. 2017) (allegations including "stress, nervousness, anxiety, and insomnia" sufficed at motion to dismiss stage).

Additionally, because "[a] defendant's state of mind can only generally only be answered with the development of a full factual record," *Medina*, 2021 WL 6063237 at *4, it would be inappropriate to dismiss Plaintiff's Intentional Infliction of Emotional Distress claim at this stage without providing an opportunity to develop the evidentiary record. *Id.* Therefore, the Court will deny this basis of Defendant's partial motion to dismiss.

## V. CONCLUSION

Defendant fails to offer any compelling arguments as to why Plaintiff's references to "reckless", "wanton", "outrageous", and "grossly negligent conduct" should be stricken. Additionally, Plaintiff alleges sufficient facts in her Complaint to make a plausible claim for punitive damages and Intentional Infliction of Emotional Distress. Therefore, for the reasons

set forth above, Defendant's Partial Motion to Dismiss the Complaint (Doc. 7) will be denied.

A separate Order will follow.

Robert D. Mariani
United States District Judge